SHAW, Richard (Ricky), An Incompetent, by his parent and next friend, STRAIN, Jessie B., Appellant,

v.

STRACKHOUSE, A., Administratrix of the Estate of Patrick J. Strackhouse, Dec'd; Enochs, D.; Boyd, D.; Williams, T. Max, M.D.; Winkey, T.; Cosner, J.; Boekhoudt, B.; Morrison, S.; Saunders, T.; Gilnett, M.; Ferguson, F.; Brown, D.; Zappo, E.; Jennings, K.; Elvin, T.; Chinofsky, S.; Smith, J.; Patton, T.; Walleigh, L.; Smith, L.; Smith, E.; Eversole, M.; Stevens, J.; Shankeweiller, J., Appellees.

No. 89-2044.

United States Court of Appeals, Third Circuit.

Argued April 26, 1990.

Decided Dec. 6, 1990.

Judith A. Gran (argued), Public Interest Law Center of Philadelphia, Philadelphia, Pa., Michael McDonnell, Drexel Hill, Pa., for appellant.

Mary Elizabeth Wolfe (argued), Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, Pa., for T. Max Williams, M.D., appellee.

Ernest D. Preate, Jr., Atty. Gen., David M. Donaldson (argued), Sr. Deputy Atty. Gen., Calvin R. Koons, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Philadelphia, Pa., for all appellees except T. Max Williams, M.D.

Before BECKER, GREENBERG, Circuit Judges and DUMBAULD, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal from the district court's grant of summary judgment against plaintiff/appellant Ricky Shaw, is a profoundly retarded man who resides at the state mental institution located in Embreeville, Pennsylvania. Shaw brought an action for damages under 42 U.S.C. § 1983 (1982) against some twenty-four employees of Embreeville, alleging that they had deprived him of constitutionally protected rights to freedom from unreasonable bodily restraint and to safe conditions of confinement. Shaw presents three federal claims. First, he asserts that he was unconstitutionally re-

[*] The Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

strained when a seatbelt was wrapped around his legs in order to secure him to his wheelchair. Second, Shaw contends that various defendants failed to protect him from abuse, and that this nonfeasance resulted in his assault on February 3, 1986. Third, he submits that even in the wake of that incident, defendants still took no steps to protect him, and that this nonfeasance resulted in a much more serious sexual assault on February 15, 1986.

Shaw argues that the district court committed legal error in three particular respects: (1) in excluding affidavits of his expert witnesses on the ground that they were not founded on personal knowledge; (2) in evaluating defendants' conduct under a deliberate indifference standard of fault, rather than the standard articulated in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), which inquires whether treatment of an involuntarily institutionalized mental patient was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462; and (3) in concluding that the record contained insufficient evidence for a jury to find that any of the defendants were personally responsible for the alleged deprivations of Shaw's constitutional rights. Shaw contends that when all of the evidence is considered and the correct legal standard is applied, the record contains genuine issues of material fact with regard to defendants' liability on each claim.

It is clear that the district court erred to the extent that it excluded the experts' affidavits solely because they were not based on personal knowledge. *See Paton v. La Prade,* 524 F.2d 862, 871 (3d Cir. 1975). To the extent that the affidavits assumed facts about this case unsupported by the record, however, the expert opinions were properly disregarded. *See Pennsylvania Dental Association v. Medical Service Association of Pennsylvania,* 745 F.2d 248, 262 (3d Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). We conclude that the experts' opinions should have been considered with respect to the third claim, but not the first two.

We conclude that the district court also erred to the extent that it applied a deliberate indifference standard in assessing the culpability of *all* defendants. Although that standard governs the liability of the nonprofessional employee-defendants, we hold that the *Youngberg* professional judgment standard should have been applied to the primary care professionals, supervisors and administrators named as defendants. Under either standard, however, we conclude that Shaw's first two claims were rightly rejected by the district court. There is insufficient evidence to support a finding that Shaw was, in fact, significantly restrained. In addition, the defendants' behavior prior to the February 3 incident can be characterized, at most, as simple negligence and thus does not rise to the level of egregiousness required under either standard.

The district court did err, however, in granting summary judgment to all defendants on Shaw's third claim, relating to the February 15 incident. We conclude that Shaw has produced evidence sufficient to show that seven of the professional defendants may have failed to exercise professional judgment in providing for his safety after February 3. As to the remaining seventeen defendants, we are satisfied that the record does not contain sufficient evidence for Shaw to survive summary judgment. Accordingly, we will affirm in part, reverse in part, and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY [1]

Shaw has an I.Q. of ten and the mental development of a ten-month-old infant. Now about forty, he has been involuntarily institutionalized since the age of four. Shaw lived at Embreeville Center, a large state institution for the mentally retarded, from 1972 until after the events giving rise to this action. While at Embreeville, Shaw

---

1. Unless otherwise indicated, the record facts set forth are undisputed.

lived in a closed ward with 15 other retarded individuals. Unable to walk, Shaw spends the majority of his time sitting in a wheelchair or crawling about under his own volition. Shaw is not toilet-trained and is unable to dress himself or to attend to his own needs. He requires virtually constant supervision.

Shaw's wheelchair was equipped with a seatbelt to prevent him from falling out of the chair. Defendant T. Max Williams, Shaw's attending physician, instructed that the belt be wrapped around Shaw's waist during transport to prevent him from slipping out of the chair. There is some evidence that the seatbelt often remained fastened much longer than necessary for safe transport. Nevertheless, when positioned around Shaw's waist, the belt did not prevent Shaw from leaving his chair. When he desired, he was able to unbuckle the seatbelt and slip onto the floor, where he could crawl about at will.

On some occasions, however, certain Embreeville staff would wrap the seatbelt under one of Shaw's legs and over the other in order to keep him more firmly secured. The record suggests that this manner of securing Shaw was somewhat more restrictive than tying the belt around his waist, although he apparently could still get out of the wheelchair. Defendant Jane Cosner, a member of the direct care staff, testified that the fastening of the seatbelt in this manner prevented Shaw from slipping down under the belt and that it made it "difficult" for him to move. Another direct care employee, defendant Thomas Saunders, testified that although the belt was "more restrictive" when tied around Shaw's legs than when around his waist, Shaw was nonetheless able to wriggle out of the wheelchair when he wanted to. The record reflects, moreover, that the seatbelt was not wrapped around Shaw's legs in this manner very often. According to defendant Deborah Brown, for example, Shaw spent about three quarters of each day in the wheelchair, yet she never noticed the belt wrapped around his legs. Although Saunders admits to being instructed in this manner of securing Shaw in the wheelchair when he first began working on

the ward, he also states that the method was not commonly employed. Other defendants are in general agreement that if the belt was wrapped around Shaw's legs at all, it was done on an infrequent basis, and there was no direct evidence to the contrary.

On February 3, 1986, Shaw disappeared from his ward for over an hour. When he was found, the staff discovered that his clothes had been tampered with and that there was blood in his diaper. Dr. Williams examined Shaw and discovered two one-quarter inch lacerations around his anus. He concluded that these injuries were most likely the result of forced penetration by a hard object and possibly of sexual assault. An internal abuse investigation was conducted, which failed to uncover the exact cause of Shaw's injury. Dr. Williams later retreated from his initial diagnosis of sexual assault, testifying at his deposition that Shaw's injury might have been due to other causes, such as rectal digging. Other Embreeville employees, however, testified that when Shaw was found on February 3, his fingernails were clean.

The record indicates that before the February 3 incident, Embreeville had provided Shaw with adequate care and appropriate treatment, and that Shaw had suffered no previous injuries at Embreeville, either accidental or inflicted. There is no indication that violence against other inmates occurred with any degree of frequency before February 3, or that *any* violence had been perpetrated upon other residents of Shaw's ward. Defendant Barbara Anderson later told police that two female patients in another ward at Embreeville had been sexually assaulted a few months before the incident. However, the record does not contain any abuse investigation report regarding these assaults, any other documentation of these assaults, or even corroborating testimony of these assaults by other Embreeville employees.

Except for conducting the internal abuse investigation, the Embreeville staff failed to take any additional precautions to protect Shaw after the February 3 incident. The staff failed to transfer him to another

ward, failed to increase the level of Shaw's supervision, failed to report the incident to the state police as required by its policy manual, and failed to isolate Shaw from James Ingram, a member of the Embreeville housekeeping staff, who by February 14 had emerged from the investigation as a leading suspect in the February 3 incident.

On February 15, twelve days after the initial incident, Shaw once again disappeared from his ward. When he was located, examination revealed a deep laceration around the base of his penis. Dr. Williams ordered Shaw taken to a local hospital, where he received medical attention. The hospital contacted the police, whose investigation of both incidents failed to identify the perpetrator. Among the staff who had access to Shaw on February 15 were Ingram; Saunders, who had been previously convicted of violent felonies; and Mary Gelnett, a direct care employee, who had been transferred from another ward because she was suspected of abusing another resident. Soon after February 15, Ingram disappeared from Embreeville without a trace.

Shaw, by his parent and next friend Jessie B. Strain, brought an action for damages under 42 U.S.C. § 1983, alleging that he was harmed as a result of defendants' failure to provide him with reasonable conditions of safety and freedom from bodily restraint. Shaw sued some twenty-four defendants, including Dr. Williams, his primary care physician; members of the primary care staff who had wrapped the seatbelt around his legs; members of the staff assigned to watch over him on both February 3 and February 15; and various administrative and supervisory officials ranging from the Director of Embreeville to Shaw's program coordinator.

After extensive discovery, all defendants moved for summary judgment. At that point, the record contained expert witness affidavits introduced by Shaw bearing on each of his three claims. In support of his bodily restraint claim, Shaw submitted two affidavits by medical professionals and one by a custodial professional. Respectively, the affidavits characterize the use of the seatbelt around Shaw's legs as "the tying of an individual into a wheelchair," (Fitzgerald affid.), "ty[ing] someone up into a chair 10 to 14 hours a day" so as to "prevent [him] from movement," (Tislow affid.), and "ty[ing] his legs around and through ... so as to prevent him from moving," (Dillon affid.).

Shaw also presented expert opinions regarding the conduct of the Embreeville staff as it related to both assaults. Dr. Roy Fitzgerald opined that allowing the February 3 incident to occur was "beyond any medical standard," given the occurrence of two prior assaults and Shaw's need for constant supervision. Dr. Richard Tislow stated that Dr. Williams had an "obligation," after the February 3 incident, to (1) conduct appropriate medical tests to determine whether a sexual assault had in fact occurred (such as checking for semen in the anus), and (2) provide additional protection for Shaw (given the likelihood that an assault had occurred). Michael Dillon, a custodial professional, echoed Fitzgerald's statements and further testified that the custodial officials at Embreeville had the same obligations to Shaw that Tislow imputed to Williams. Dillon also opined that they had a "fundamental obligation" to inform the police immediately of the February 3 incident.

The district court granted summary judgment in favor of all defendants as to all claims. Shaw appeals that judgment.

Summary judgment is appropriate only if there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). We make this determination based on the relevance and quantum of evidence adduced by the nonmoving party. If the evidence is such that a reasonable jury could find for the nonmoving party under the applicable substantive law, then summary judgment must be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Our scope of review is plenary. *See, e.g., Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1093 (3d Cir.1988)..

■ In order to prevail in a § 1983 action, a plaintiff must establish (1) that "the

conduct complained of was committed by a person acting under color of state law" and (2) that the "conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). It is clear that defendants are all state actors. There is also no question that the rights Shaw alleges he has been deprived of—the right to freedom from bodily restraint and the right to safe conditions of confinement—are encompassed within the "liberty" substantively protected by the fourteenth amendment due process clause. *See Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2457–58. The only question, then, is whether there is a genuine issue of material fact as to whether any of the defendants engaged in conduct that deprived Shaw of these rights.

## II. THE WHEELCHAIR RESTRAINT CLAIM

■ In view of the factual similarities between this case and *Youngberg*, we accept Shaw's statement of the legal standard ˙ applicable to determine whether a bodily restraint is constitutional: it is unconstitutional "except when and to the extent professional judgment deems this necessary to assure ... safety or to provide needed training." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462.[2] We agree with the district court's conclusion, however, that the record contains insufficient evidence to support a threshold finding that Shaw was, at least for constitutional purposes, bodily restrained.

Numerous witnesses testified that Shaw could, when he wanted to, undo his seatbelt and leave his wheelchair to crawl around on the floor. Saunders testified, moreover, that Shaw could leave his wheelchair even when the seatbelt was fastened around his legs, which was only occasionally. For purposes of deciding this appeal, we must accept as true Shaw's proffered evidence that the belt, when fastened around his

legs, was "more restrictive" than when fastened around his waist, and that it made his movement "difficult." This is a far cry from the arm restraints at issue in *Youngberg*, which kept inmates "shackled to [a] bed or chair for long periods of time each day." *Romeo v. Youngberg*, 644 F.2d 147, 160 (3d Cir.1980) (en banc), *vacated*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Given Shaw's ability to exit the wheelchair, albeit with some difficulty, we conclude that the degree of restraint imposed by defendants' occasional use of the seatbelt around Shaw's legs is simply not great enough to trigger due process protection.

■ Shaw contends that the district court erred in disregarding the testimony of his experts, who concluded that the practice of wrapping Shaw's seatbelt around his legs was inconsistent with the exercise of professional judgment. The experts, of course, need not have observed Shaw's treatment personally in order to render an opinion as to its professional acceptability. *See* Fed.R.Evid. 703. To the extent that their opinions were predicated upon factual assumptions about the effect of the seatbelt on Shaw's freedom of movement, however, those assumptions "must find some support in the record." *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania*, 745 F.2d 248, 262 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). In this case, each of the expert opinions explicitly assumed that Shaw was prevented from leaving his wheelchair when his seatbelt was wrapped around his legs. Because, as noted above, this assumption has no support in the record, the district court did not err in disregarding the experts' conclusions. *See id.*

## III. FAILURE TO PROTECT—THE FEBRUARY 3 INJURY

■ Shaw's second claim is that the Embreeville staff failed to provide him with reasonable conditions of safety and

---

**2.** We reserve for later, *see infra* part IV, the question whether the professional judgment standard or the deliberate indifference standard applies to the failure to protect claims arising out of the February 3 and 15 injuries.

that this failure resulted in his February 3 injury. We begin with the proposition that conduct amounting to no more than simple negligence cannot constitute a violation of the constitutional right to due process, regardless of whether the conduct is better characterized as nonfeasance, *see Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (negligent failure to protect), or misfeasance, *see Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligently leaving a pillow on stairs). We conclude that, on any reasonable reading of the record, defendants' conduct in protecting or failing to protect Shaw prior to the February 3 incident was at most negligent. We may therefore affirm the grant of summary judgment on Shaw's second claim without deciding the degree of fault, beyond mere negligence, that *is* necessary to give rise to a due process claim for failure to protect an involuntarily committed mental patient.

■ The record indicates that before February 3, 1986, Shaw received adequate supervision and appropriate care. In well over a decade of living at Embreeville, Shaw had no history of previous injuries, either accidental or inflicted, and he proffered no evidence to indicate that he was subject to neglect or abuse during this time. As we have explained, Shaw required close supervision, and it is disturbing that no responsible employee was watching him when he left or was taken from his ward on February 3. We think it necessary, however, to contrast this failure to supervise with the failure at issue in *Youngberg*, in which the Supreme Court held that the state has an affirmative duty to protect involuntarily committed mental patients. Romeo himself was injured not once or twice, but sixty or seventy times. *See Youngberg*, 457 U.S. at 310, 102 S.Ct. at 2455; *Romeo*, 644 F.2d at 155. Although the failure to prevent a "pattern of attacks, injuries, or violent behavior" is actionable, "[t]he right to protection is not activated by an isolated mishap, or called into question by each bruise that a patient may suffer." *Romeo*, 644 F.2d at 163. We do not mean to minimize the seriousness of Shaw's February 3 injury. We

conclude, however, that the failure of the responsible staff member to keep watch over Shaw at the instant he happened to leave or be taken from his ward on February 3 amounts to just such an "isolated mishap." It cannot amount to more than simple negligence.

■ Shaw emphasizes three aspects of the case that, he contends, are sufficient to create a genuine issue of material fact as to whether defendants' acts and omissions on February 3 rose beyond the level of simple negligence: (1) the two sexual assaults perpetrated against other residents that evidently occurred a few months prior to February 3; (2) the presence in Shaw's ward of employees with prior criminal records; and (3) the affidavits of two of his experts, who asserted that the occurrence of the February 3 assault cannot be reconciled with the exercise of professional judgment. We do not think that any of these aspects of the case, either singly or in combination, is sufficient to present a genuine issue of material fact.

The record contains no evidence about the two prior assaults other than two fleeting references made by Embreeville employee Anderson during the police investigation of Shaw's February 15 injury and, later, during her deposition by Shaw's counsel. Of course, for summary judgment purposes, we must assume that they occurred. Absent any evidence of a more general security problem at Embreeville, however, or that the risk of ongoing harm suggested by the prior assaults was focused specifically on Shaw himself or other residents of Shaw's ward, we think that Embreeville's failure to increase the level of supervision of Shaw or Shaw's ward from levels that had proven adequate for over a decade amounts at most to negligence.

■ Similarly, we think that Shaw overstates the significance of Embreeville's employment and assignment of staff. Shaw focuses on the presence in his ward of James Ingram, who became a primary suspect in the February 3 assault and who disappeared shortly after the February 15

assault. We think that the failure to isolate Shaw from Ingram, or to provide Shaw with extra protection, could transcend simple negligence once Embreeville officials determined that Shaw had been assaulted and that Ingram was a likely perpetrator. This conclusion bears on our analysis of defendants' culpability for the February 15 incident, *see infra* part IV, but not for the February 3 incident. We find nothing in the record indicating that defendants either knew or should have known of the risk posed by Ingram to Shaw or his wardmates as of February 3. Their failure to increase Shaw's supervision cannot be condemned on this basis.

■ Finally, we agree with the district court that the plaintiffs' expert affidavits are insufficient to create a genuine issue of material fact with regard to the February 3 incident. Although the affidavits assert that no professional judgment was exercised, they fail to explain why this is so, or what alternatives professional judgment would indicate. Because the affidavits are " 'essentially conclusory' and lacking in specific facts," *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985) (citation omitted), the district court did not err in disregarding them.

## IV. FAILURE TO PROTECT—THE FEBRUARY 15 INJURY

■ Shaw's third claim is that the Embreeville staff did not adequately investigate the February 3 incident and that they did not take appropriate steps to protect him from further assaults. This inaction, Shaw claims, resulted in his February 15 injury.

As we noted, under Shaw's theory of the case, he must, in order to maintain a § 1983 claim, demonstrate that the defendants' conduct or inactions deprived him of his constitutional right to due process of law. For analytical purposes, Shaw's burden can be subdivided, much as for any ordinary tort claim, into two separate proofs. First, Shaw must show that defendants' owed him a duty of care. Second, Shaw must show that defendants' actions or inactions failed to satisfy their duty of care and that this failure led proximately to the deprivation of constitutional rights he suffered. We consider these issues in turn.

### A. *Standard of Care*

■ State officials generally do not have an affirmative duty to protect citizens not in their custody from injuries inflicted upon them by a third party. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 1004–05, 103 L.Ed.2d 249 (1989). Once the state restrains an individual's liberty, rendering that individual unable to act for himself, however, the state does acquire an affirmative duty to protect. *Id.* 109 S.Ct. at 1005–06. The requisite physical custody may arise in a variety of forms, including involuntary mental commitment and (criminal) incarceration. The degree of affirmative care expected of state officials may vary with the type of physical custody involved.

Shaw essentially contends that the district court granted summary judgment based on the erroneous application of a standard of care governing a form of physical custody different from his own. Shaw points out that "deliberate indifference," the standard applied by the district court, is the appropriate measure of a prison official's conduct in cases alleging "cruel and unusual" punishment under the eighth amendment, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). Shaw argues, in contrast, that the due process clause of the fourteenth amendment requires state actors responsible for involuntarily institutionalized individuals who are mentally retarded to be held to the more exacting professional judgment standard of *Youngberg*.

At first blush, Shaw's argument appears irrefutable. Faced with claims substantially similar to those at bar, the *Youngberg* Court was clearly of the view that the mentally retarded—whose involuntary institutionalization, although sometimes unavoidable, is in no way a product of their own fault—merit greater constitutional

vigilance from their caretakers than do ordinary prisoners. *See Youngberg,* 457 U.S. at 322, 102 S.Ct. at 2461.[3] Hence, the Court believed that state officials entrusted with the care of the mentally retarded should be held to a higher standard of care than prison officials. The Court was wary, however, of placing too onerous a burden on these officials. Consequently, the Court, following the lead of Judge Seitz's concurrence, *see Romeo,* 644 F.2d at 178, adopted the "professional judgment" standard as a middle-ground between the "deliberate indifference" standard applicable to prison officials and the "compelling" and "substantial" necessity tests that had been embraced by a majority of this court. *See Youngberg,* 457 U.S. at 321–22, 102 S.Ct. at 2461.

▉ The deliberate indifference standard requires a showing, in cases alleging that a state actor failed to provide adequate protection, that the state actor was recklessly indifferent, grossly negligent, or deliberately or intentionally indifferent. *See Williams v. Borough of West Chester,* 891 F.2d 458, 464 n. 10 (3d Cir.1990); *Colburn v. Upper Darby Township,* 838 F.2d 663, 668 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Commonwealth Bank & Trust Co. v. Russell,* 825 F.2d 12, 16 (3d Cir.1987); *Davidson v. O'Lone,* 752 F.2d 817, 828 (3d Cir.1984) (en banc), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In contrast, the professional judgment standard adopted by the Court requires only that a plaintiff show that "[a] decision . . . is . . . a substantial departure from accepted professional judgment, practice, or standards." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462.

Given *Youngberg* 's unambiguous rejection of the deliberate indifference standard in the context of involuntarily institutionalized retarded citizens, the district court's application of the deliberate indifference

standard to Shaw's claims would appear to be incorrect. Defendants advance two colorable arguments, however, in support of the district court's application of a deliberate indifference standard. Defendants contend, first, that the professional judgment standard enunciated in *Youngberg* does not apply in cases, such as this one, that solely involve allegations of a failure to protect. Like Ricky Shaw, Nicholas Romeo claimed that he was injured as a result of the failure of state officials to protect him. Unlike Ricky Shaw, however, Nicholas Romeo also presented viable claims that he was excessively restrained and that he was not provided with adequate habilitation to correct his violent tendencies. According to defendants, the *Youngberg* Court espoused the professional judgment standard primarily in response to these claims of excessive restraint and failure to habilitate. The application of the professional judgment standard to Romeo's failure to protect claim, defendants argue, was something of an afterthought by the Court. Presented with a failure to protect claim standing alone, they say, the *Youngberg* Court would have eschewed its novel professional judgment standard in favor of the deliberate indifference standard that governs the conduct of state officials in failure to protect cases in other custodial contexts. Therefore, defendants argue, *Youngberg* 's treatment of failure to protect claims must be limited to its facts.

On a purely conceptual level, defendants' argument is not without force; superficially at least, a distinction can be made between affirmative decisions to habilitate or restrain, *cf. Rennie v. Klein,* 720 F.2d 266 (3d Cir.1983) (en banc) (physician's decision to administer forcibly antipsychotic drugs to involuntarily committed mental patient must be based on exercise of professional judgment), and a failure to protect. Nonetheless, the argument finds no support in *Youngberg* itself. That opinion is completely devoid of any suggestion that the application of a professional judgment

---

**3.** Nicholas Romeo, like Ricky Shaw, was a profoundly retarded and institutionalized man who claimed that state officials had violated his constitutional rights by failing to protect him from

injuries, by unnecessarily restraining him, and by failing to provide him with appropriate habilitation.

standard to a failure to protect claim brought by an involuntarily committed retarded individual is contingent on the existence of associated habilitation or restraint claims. Absent even a hint that the Court meant to so limit its holding, we must read *Youngberg* at face value and apply the professional judgment standard to all failure to protect, excessive restraint, and failure to habilitate claims brought by mentally retarded persons who are institutionalized, whether such claims are brought independently or in tandem.

Defendants' second argument is that even if *Youngberg* did apply the professional judgment standard to independent claims alleging a failure to provide adequate protection, this holding has been eviscerated by the Court's later decisions in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Defendants reach this conclusion by constructing a syllogism. Defendants assert, first, that *Davidson* and *Daniels* held that liability under the due process clause of the fourteenth amendment cannot arise "where a government official is merely negligent in causing [a plaintiff's] injury." *Davidson*, 474 U.S. at 346, 106 S.Ct. at 669. Defendants argue, second, that when applied to a failure to protect claim, the professional judgment standard of *Youngberg* is the functional equivalent of a negligence standard. The logical conclusion of this two-step reasoning, defendants contend, is that *Davidson* and *Daniels* have implicitly overruled *Youngberg*, at least as regards failure to protect claims.

■ This syllogism is facially plausible, but ultimately erroneous. Defendants' reading of *Davidson* and *Daniels* is unimpeachable. Mere negligence cannot trigger due process protection. We think, however, that defendants' attempt to equate professional judgment and negligence falls short of the mark. Professional judgment is a relatively deferential standard. It requires only that a state actor exercise professional judgment in choosing the appropriate course of action. Negligence, however, imposes on a state official the burden of choosing, from among alternatives, a course of action consistent with the exercise of "due care." That means, as we see it, rejecting negligent alternatives that might nonetheless satisfy the demands of professional judgment.

■ Admittedly, the two standards are premised on different criteria. Thus, any attempt to place the two on a single continuum risks becoming, in the vernacular, a comparison of "apples and oranges." This dissimilarity notwithstanding, professional judgment appears to us to be a substantially less onerous standard than negligence from the viewpoint of the public actor. Indeed, in our view, professional judgment more closely approximates—although, as we have discussed, remains somewhat less deferential than—a recklessness or gross negligence standard. Professional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct.

This taxonomy is, we think, fatal to defendants' argument. The *Daniels* Court clearly held that simple negligence is insufficient to trigger due process protection. The Court explicitly refused, however, to extend its holding to preclude due process protection based on interim standards such as recklessness, gross negligence, and (by our analysis) professional judgment. *See Daniels*, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3. Hence, contrary to defendants' assertions, the professional judgment standard of *Youngberg* is not implicitly overruled by *Davidson* and *Daniels*. Courts of Appeals have no business overruling Supreme Court decisions. Until the Court acts more definitively, *Youngberg* remains good law.[4]

---

4. We are in no position, of course, to predict the future path of Supreme Court jurisprudence. If recent holdings are any indication of the Court's sentiment, however, *Youngberg* is in no immediate danger. We note, in particular, Chief Justice Rehnquist's majority opinion in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which contains an extensive discussion of the continuing viability of *Youngberg* and the

██ The district court's application of a deliberate indifference standard, though generally contrary to *Youngberg*, was partly correct for a reason not raised by defendants. Despite its concern for the institutionalized mentally retarded, the *Youngberg* Court did not apply the professional judgment standard to all those charged with caring for such individuals. The Court applied the standard only to "professional decisionmakers," defined as:

> [P]erson[s] competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

*Youngberg*, 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30. Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg*, only to a deliberate indifference standard.

██ As we read the present record, fourteen of the defendants named by Shaw qualify as "professionals" under the *Youngberg* definition. These include Superintendent Strackhouse, Assistant Superintendent Enochs, Dr. Williams, Program Coordinator Boyd, Unit Manager Eversole, Senior Resident Supervisor E. Smith, Senior Resident Supervisor Stevens, Residential Services Supervisor Shankweiler, Nurses Patton, Walleigh, and L. Smith, Occupational Therapist Elvin, Special Education Teacher Chinofsky, and Recreation Director J. Smith. As to these defendants, the district court was in error in applying a deliberate indifference standard. The remaining ten defendants, all residential service aides, clearly are nonprofessionals for

purposes of applying the *Youngberg* professional judgment standard. These include defendants Winkey, Cosner, Boekhoudt, Morrison, Saunders, Gilnett, Ferguson, Brown, Zappo and Jennings. As to these defendants, the district court was not in error in applying a deliberate indifference standard.

### B. *Did Defendants Satisfy Their Standards of Care?*

██ Our determination that a professional judgment standard applies to professionals and that a deliberate indifference standard applies to nonprofessionals does not resolve, of course, Shaw's claim that the district court improperly granted summary judgment to all defendants. To assess the propriety of summary judgment, we must measure the various defendants' conduct against the substantive requirements of the two standards. We begin with a consideration of the fourteen professional defendants.

██ As the district court correctly noted, "[l]iability under § 1983 cannot be imposed vicariously or under traditional grounds of respondeat superior." *Shaw v. Strackhouse*, No. 88–0780, slip op. at 7, 1989 WL 138876 (E.D.Pa. Nov. 13, 1989) (citing *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)). All professional members of the Embreeville staff are not, *ipso facto*, liable solely because one or more of their colleagues failed to exercise professional judgment on Shaw's behalf. Only those defendants whose inactions or actions personally caused Shaw's injury may be held liable under § 1983. In more concrete terms, liability may only be imposed on those defendants who had the power and the responsibility to protect Shaw's safety after February 3, but who failed to do so.

██ That said, we find problematic the district court's conclusion that Shaw produced "no evidence ... which ties *any* of the defendants directly to the cause of

---

affirmative obligation it imposes on state officials, under the due process clause, "to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *Id.* at 1005.

Ricky Shaw's injuries." *Shaw,* slip op. at 10 (emphasis added). As the district court notes, Shaw has not proven that any of the defendants personally inflicted his injuries. Nor has Shaw proven that the defendants attempted to "cover-up" evidence of injuries inflicted by a third party. But neither of these proofs are necessary elements of a cause of action under § 1983.

Having subjected Shaw to their custody, the Embreeville staff assumed an affirmative duty to protect Shaw from threats to his safety, including harm from third parties or even from Shaw himself. *DeShaney,* 109 S.Ct. at 1005 (citing *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458). Given this affirmative duty, Shaw need not show that defendants inflicted or covered up his injuries. To survive summary judgment, Shaw need only raise a genuine issue of material fact regarding the causal connection between an individual defendant's actions and Shaw's injury. *See Duchesne v. Sugarman,* 566 F.2d 817, 830–31 (2d Cir. 1977).

Admittedly, Shaw casts a broad net over potentially responsible parties. Not all fourteen professional defendants had the authority or the responsibility to see that Shaw received enhanced protection after February 3. After reviewing the record in some detail, we think, however, that Shaw has produced sufficient evidence to survive summary judgment with respect to his claims that seven of the professional defendants failed to exercise professional judgment prior to the second assault. These defendants are Superintendent Strackhouse, Assistant Superintendent Enochs, Dr. Williams, Program Coordinator Boyd, Unit Manager Eversole, Senior Resident Supervisor E. Smith, and Residential Services Supervisor Shankweiler. As to these seven defendants, summary judgment was inappropriate and will be reversed. The record fails to raise a genuine issue of material fact as regards the exercise of professional judgment by the remaining seven professional defendants. As to these seven defendants, summary judgment was appropriate and will be affirmed.

Dr. Williams examined Shaw on February 3 and originally concluded that his injury may have been related to sexual abuse. At no time, however, did Williams examine Shaw for signs of sexual assault (such as semen in the anus) or conduct other appropriate screening procedures. Nor did Williams order any changes in Shaw's security regime—something he clearly had the power, although, he contends, not the responsibility, to do. Williams did inform the Administrative Officer on Duty (AOD) of Shaw's injury. The AOD initiated an investigation of the incident. Neither Williams nor any other staff member informed the Pennsylvania State Police of the February 3 incident, however, although the policy manual to which Embreeville is subject generally directs institutional officials promptly to report incidents involving assault or sexual abuse. *See* An Investigative Manual for Use in Client Abuse Investigations at State Centers and M.R. Units, 14, 23–25.

As the investigation commenced, several of the defendants conferred openly about the possibility that Shaw had been sexually assaulted. Unit Manager Eversole and Supervisor Shankweiler had such a conversation on the night of February 3. The conversation ended with Eversole, who by her own admission was "responsible for the clients ... in [Shaw's] building 24 hours a day," promising to consult the following morning with Assistant Director Enochs, whose responsibilities included overseeing security operations. The record also reflects that other supervisory personnel, including Program Coordinator Boyd and Supervisor E. Smith, were made aware of Shaw's injury. Both had the power to increase Shaw's supervision. In fact, the record reflects that Smith had the primary responsibility for calling a "team meeting" of all employees to discuss Shaw's injury and options to ensure his future safety. No such meeting was ever held. Indeed, despite all the discussion at the supervisory level, the record contains abundant evidence that direct care employees were never instructed to increase Shaw's monitoring or to take additional precautions to enhance his security.

By February 14, the investigation had still failed to determine the cause of Shaw's injury or the persons responsible. The in-

formation adduced suggested, however, that the responsible person was probably a member of the Embreeville staff or someone else with regular access to Shaw. Indeed, the investigator had narrowed the list of likely perpetrators to three employees. Thus, the possibility of another attack was apparent. Still no further precautions or protective measures were undertaken on Shaw's behalf. Shaw was not transferred to another institution, moved to another ward, or even provided with increased supervision or monitoring. Nor was Shaw isolated from those specific individuals who had been identified by the abuse investigator as possible perpetrators of the February 3 incident. Assistant Director Enochs stated that at this point she finally suggested that Shaw's injury be reported to the police. Enochs claims she was overruled, however, presumably by Director Strackhouse, who as a regular policy was kept aware of such investigations.

In short, all seven of these defendants were aware that Shaw probably had been attacked, that the perpetrator still had frequent and unsupervised access to him, and that another attack was possible. The record suggests also that all seven had the power and may have shared in the responsibility to protect Shaw from further injury. Still nothing was done.

As established by the affidavits of Shaw's expert witnesses, exercise of any one of the options to increase Shaw's safety—or perhaps even a reasoned failure not to exercise them—might have constituted an exercise of professional judgment. Shaw's expert witnesses opined, however, that the total inaction of those in a position to protect Shaw constituted a failure to exercise professional judgment on Shaw's behalf. Dr. Richard Tislow, one of Shaw's experts, stated in his affidavit that, after the first injury, Dr. Williams had an "obligation" to conduct the appropriate medical tests to determine whether a sexual assault had occurred and to provide additional protection for Shaw pending identification of the perpetrators. According to Michael Dillon, another of Shaw's expert witnesses, it was the responsibility of the professionals at Embreeville to do more than simply investigate Shaw's first injury. Because

an assault may have been committed, Dillon stated that the professionals had a "fundamental obligation" to inform the police immediately, and should have taken additional measures to protect Shaw.

Importantly, the defendants have not offered any expert evidence to refute the assessment by Shaw's experts that the defendants' conduct after February 3 was inconsistent with the exercise of professional judgment. Nor do we find merit in the trial court's ruling and defendant's assertion that Shaw's experts' testimony should be excluded. The conclusions of Shaw's experts that he was excessively restrained were properly excluded as unsupported by the facts of record. As to Shaw's claim regarding the February 15 incident, however, the record reflects an adequate, indeed virtually uncontested, factual basis upon which Shaw's experts could form their opinion. It is abundantly clear that, apart from initiating an investigation into the February 3 incident, defendants did nothing to bolster Shaw's ongoing security.

In short, the record evidence, including the admissible expert testimony presented by Shaw, raises serious questions, in our view, about the performance of these seven defendants between February 3 and 15. Certainly a jury could reasonably find that the defendants' actions, and particularly their failure to increase Shaw's security or transfer him to another location after February 3, constituted a failure to exercise professional judgment.

This is not to say that all, or indeed any, of the seven will ultimately be liable to Shaw. We reverse the summary judgment in favor of these seven at this time precisely because, although there is sufficient evidence to implicate each, the record does not point unambiguously to a particular individual or individuals. But such uncertainty at this stage is to be expected. Identification of a responsible party or parties within a complex, overlapping chain of command is often a difficult task. Numerous variables must be factored into the analysis: the amount of information known to various defendants; the scope of their duties and authority; their training and expertise; the allocation of decisionmaking power within

the organization; reporting and review relationships; established and formal decisionmaking procedures; and informal custom and practice. All of this can be sorted-out on remand. But, given the complexity of this analysis, Shaw should not be penalized at the summary judgment stage for failing to identify precisely which defendant or defendants dropped the ball.

 We have held that summary judgment was clearly inappropriate as regards seven of the fourteen professional defendants subject to a professional judgment standard. As discussed previously, the plaintiff carries a greater burden when trying to show deliberate indifference than when trying to establish a failure to exercise professional judgment. It is difficult to define with precision, however, the degree of aggravating conduct beyond failure to exercise professional judgment necessary to constitute deliberate indifference. Caselaw under § 1983 is clear, however, that conduct amounting to a failure to protect rises to the level of deliberate indifference precisely in those circumstances when the defendant specifically knew or should have known of the harm to the plaintiff before it was manifested. *See Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir.1988). The crux of Shaw's February 15 claim, and as borne out by the record, is that the February 3 attack imparted to all defendants, including the ten non-professionals, the specific knowledge that he was at risk of future assaults by the same (albeit unidentified) source. Thus, as an initial matter Shaw's claim against the nonprofessional staff members appears plausible.

Upon further examination, however, it is clear that Shaw's claim against the nonprofessional defendants must fail. Someone at Embreeville should have seen to Shaw's safety. As we have discussed, one or more of the professional defendants may have violated their obligation to exercise professional judgment by failing to do so. We think the evidence adduced in the summary judgment record inadequate, however, to demonstrate that any of the nonprofessional employees were deliberately indifferent. Simply put, the record does not indicate that any of the ten nonprofessionals had

the power or responsibility to see that Shaw received enhanced protection after February 3. Thus, even assuming that all ten knew that Shaw may have been sexually assaulted on February 3, their subsequent inaction was not causally related to Shaw's injury. Nor is there evidence that any of them took any specific action adverse to his safety. As to these ten defendants, the district court did not err in granting summary judgment.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court with respect to Shaw's first and second claims will be affirmed. The summary judgment with respect to the third claim (the February 15, 1986 incident) will be reversed, however, as to defendants Strackhouse, Enochs, Williams, Eversole, Boyd, E. Smith and Shankweiler, and the case remanded to the district court for further proceedings consistent with this opinion. As to the remaining defendants, summary judgment with respect to the third claim will be affirmed.